In re SPIRIT HOLDING COMPANY, INC., et al., Debtors.

CENTRAL CITY SOUTH ASSOCIATES, Plaintiff and Counter–Defendant,

v.

SPIRIT HOLDING COMPANY, INC. and Central Hardware Company, Inc., Defendants and Counter–Plaintiffs.

Bankruptcy No. 93–42135–293.
Adv. No. 93–4473.

United States Bankruptcy Court, E.D. Missouri, E.D.

Jan. 10, 1994.

John Collen, Sonnenschein Nath & Rosenthal, Chicago, IL, and David A. Sosne, St. Louis, MO, for debtors.

Stanley M. Brandmeyer, Clayton, MO, for Cent. City South Associates.

I. William Cohen, Pepper, Hamilton & Scheetz, Detroit, MI, and Neil Weintraub, Newman, Goldfarb, Freyman & Stevens, P.C., Clayton, MO, for Unsecured Creditors' Committee.

Michael Richman, Mayer, Brown & Platt, New York City, and David A. Warfield, Husch & Eppenberger, St. Louis, MO, for Bank Group.

### MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A) and (O), which the Court may hear and determine. Venue is proper pursuant to 28 U.S.C. § 1409(a).

### PROCEDURAL BACKGROUND

1. Spirit and Central are Debtors and Debtors–In–Possession herein, having filed voluntary petitions for relief under Chapter 11, Title 11, United States Code ("Bankruptcy Code") on March 23, 1993 and March 29, 1993, respectively.

2. Central City South Associates ("Central City") is a Missouri general partnership, comprised of fifteen individuals. George Kister is a general partner and manages the property.

3. Spirit is the lessee and Central City is the lessor under a certain lease of non-residential real property dated January 28, 1971 ("Original Lease"), as amended on January 7, 1980 and January 23, 1993, and as further amended by the Second Amendment To Lease dated July 26, 1991 ("Second Amendment") (collectively, the "Lease"). Pursuant to the Lease, Spirit leases space in Central City South Shopping Center located at 4445 Lemay Ferry Road, St. Louis, Missouri ("Shopping Center"). Central, in turn, subleases the premises from Spirit.

4. Pursuant to a hearing held on July 21, 1993, this Court entered an order extending the Debtors' time to assume or reject leases for non-residential real property until November 30, 1993, subject to the right of each landlord to seek a shortening of such time for cause shown.

5. On July 21, 1993, Central City filed its Amended Objection To Debtors' Motion For A Second Extension Of Time To Assume Or Reject Unexpired Leases ("Objection"), and, on the same day, this Court deemed Central City's objection to be a motion to compel assumption or rejection of the Lease.

6. On or about September 2, 1993, this Court granted Debtors' motion to apply all of the rules in Part VII of the Federal Rules of Bankruptcy Procedure.

7. On September 3, 1993, Debtors filed their Answer, Affirmative Defenses and Counterclaims of Spirit Holding Company, Inc. and Central Hardware Company, Inc. to

Central City South Associates' Motion To Compel Assumption Or Rejection Of Lease ("Answer").

8. A hearing was held on September 21, 1993 on the Landlord's Objection and Debtors' affirmative defenses and counterclaims. The Court orally entered an Order requiring the Debtors to assume or reject the Central City Lease on or before October 26, 1993, and further, orally Ordered on the record that:

(i) Debtors did not cause Landlord to be denied refinancing; and

(ii) Debtors reasonably withheld consent to Landlord's proposed development of two outlots together, but unreasonably withheld consent to the proposed development of one of the outlets alone.

The remaining issues raised at the September 21 hearing, concerning the alleged nonmonetary defaults asserted in the Landlord's Objection and the Debtors' counterclaims and affirmative defenses were taken under advisement.

9. Debtors neither assumed nor rejected the Lease unconditionally as of October 26, 1993. However, on October 26 the Debtors filed their Motion To Assume Conditionally The Unexpired Central City Lease. The Motion provided in part:

"By this Motion, Spirit elects, and seeks approval of the following election, to assume the Lease, conditioned upon: (i) a finding by the Court that the Debtors are not in default of the Lease and that Landlord has not suffered any actual pecuniary losses which must be cured, or that any defaults or pecuniary losses are so minor that Spirit, in its sole discretion, decides to assume the lease anyway; (ii) the Landlord waiving any objections under § 365 to the assignment of the lease to one of the purchasers of Central; (iii) Landlord's compliance by a date certain with its own obligation under the terms of the Lease and immediate cure of its own defaults; and (iv) Landlord's expansion of the shopping center being in full compliance with all applicable local ordinances. Such conditional assumption is legally appropriate when the conditions relate to *lessor's* compliance with the terms of the Lease. No

election to assume or reject the sublease between Spirit and Central is made at this time."

The Creditors' Committee filed a statement in support of the Debtors' Conditional assumption of the unexpired lease; while Central City filed its objection. A hearing was held on November 3, 1993 to consider said Motion. During the course of the hearing the Debtors' counsel explained that because the Court had not ruled on the remaining issues raised at the September 21 hearing, it was difficult for the Debtors to make an unconditional election. The Debtors preferred to assume conditionally, but in the alternative if the conditional assumption was unacceptable to the Court, they elected to assume the Lease without conditions. Debtors' counsel stated, "let me make it clear, we are assuming [the Lease]." To clarify their intent, the Debtors orally amended their Motion by removing the conditional aspect of its assumption. On November 3, after the conclusion of the hearing, the Debtors filed their Motion Amending Debtors' Motion To Assume Conditionally The Unexpired Central City Lease, which provided in part:

"1. As an alternative to assuming the Central City Lease ('Lease') upon the conditions set forth in the Motion, Debtor hereby assumes that Lease subject only to such conditions as the Court may impose. If the Court determines not to impose any conditions, then Debtor hereby assumes the Lease without any of the conditions set forth in the Motion."

On November 4, 1993, Central City renewed its objection to the Debtors' Amended Motion. Thereafter, the Bank Group filed its response indicating it supported the Debtors' conditional assumption, but opposed the amended unconditional assumption of the unexpired lease.

## FACTUAL BACKGROUND

Upon consideration of the testimony, exhibits, arguments of counsel and briefs, the Court makes the following findings of facts:

1. The leased premise is a Central Hardware Store (the "Store") which includes in-

door and outdoor sales areas, offices and storage areas.

### CENTRAL CITY'S OBJECTIONS

2. In Paragraph 3 of its Objection, Central City alleges that Debtors have encroached upon common areas of the Shopping Center by using and occupying common area space for the sale and display of merchandise. The alleged encroachment occurred in a certain fenced-in, outside sales area, which was expanded in 1992, pursuant to the Second Amendment. Prior to the expansion, the existing Outside Sales Area totalled 6,293 square feet. The Second Amendment permitted Debtors to expand the existing Outside Sales Area south of the Store by "approximately 5,000 square feet" ("Additional Outside Sales Area"). Article XXVIII of the Original Lease, as amended by the Second Amendment, provides that the Outside Sales Area is "hereby expanded to include the area as generally identified on Exhibit B–1 and specifically per the plans and specifications of renovation by Lessee." The plans and specifications submitted to Central City, by the Debtors, contemplated expanding the Outside Sales Area to the outside wall of the neighboring structure. Instead of adding "approximately 5,000 square feet", the plans and specification actually resulted in an Additional Outside Sales Area of 6,814 square feet, or a total of 13,107 square feet. This total area was surrounded by a twelve foot chain link fence and is currently used by the Debtors.

At the time of the expansion Central City did not object to the size of the Additional Outside Sales Area. Later, however, Central City objected that the height and location of the fence (the "Fence") surrounding the Outside Sales Area constituted a breach of the Lease because the Fence stands 12 feet high as opposed to 8 feet, is located outside of the leasehold area, and blocks the view of at least one tenant. As previously noted, the Fence is located within the Outside Sales Area as contemplated and agreed by the parties and set forth in the 1992 plans and specifications submitted to Central City prior to the installation of the Fence. The location of the Fence is not a default. Nor is the height and angle of the Fence a default, because Debtors are permitted to "fence-off" all or part of the Outside Sales Area, pursuant to Article XXVIII of the Original Lease. Neither Article XXVIII nor any other Article of the Lease restricts the height of the Fence.

Debtors explained to Central City that they needed to increase the height of the Fence surrounding the Outside Sales Area to reduce the theft of merchandise from the Store. An 8–foot fence did not prevent thieves from throwing merchandise over the fence, whereas a 12–foot fence made it very difficult to throw items over the fence.

In response to complaints by Central City that the Fence was blocking the view of a tenant south of the Store, Debtors and Central City, through its agent Rod Jones, entered into an agreement on May 1, 1992 to angle the Fence in order to maximize the view of the complaining tenant. This agreement was reduced to a written diagram which showed the location of the angled fence and noted the Fence was twelve feet high. Immediately after entering this May 1, 1992, agreement, Debtors moved the Fence according to the terms of the agreement. The May 1 agreement resolved all disputes regarding the location and height of the Fence.

3. Central City alleges that Debtors are in default under the Lease for using and occupying part of the front parking lot for the display and sale of certain merchandise ("Temporary Sales Area"). Central City complains that the Temporary Sales Area exceeds the size intended by the parties and contains merchandise beyond the scope of what is permitted under the Second Amendment. Pursuant to Article XXXXII of the Lease, Debtors are permitted to display and sell merchandise on the sidewalk and parking lot in front of the Store from March 1 through July 31 of each lease year. The *only* restrictions set forth in Article XXXXII are: (i) no displays or merchandise shall be placed on the sidewalk within 10 feet of the north boundary of the front of this Store; (ii) Debtors' right to place displays and merchandise in the Temporary Sales Area shall be subject to Central City's reasonable restrictions as to location and size; and (iii) the

types of merchandise displayed in the Temporary Sales Area shall be limited to landscaping materials and accessories.

During the period March 1, 1993 through July 31, 1993, Debtors displayed and sold merchandise using the Temporary Sales Area. The only complaint received from Central City prior to the filing of Central City's Objection was a request by George Kister in May, 1993 to reduce the height of bagged goods that were stacked within the Temporary Sales Area. Debtors promptly complied with Central City's request to reduce the height of such displays. During the period March 1, 1993 through July 31, 1993, Debtors complied with the restrictions set forth in Article XXXXII of the Lease and currently remain in compliance.

4. In paragraph 4 of its Objection, Central City alleges that Debtors are in default under the Lease because they stored inventory and materials on common areas behind the Store. Debtors admit that they used the common area behind their business for the storage of inventory and materials but deny that such conduct constituted a default. The area in question was common ground and the Lease, as amended, did not give the Debtor the authority to use the area for storage. When this problem was brought to the Debtors' attention, they removed the inventory. This allegation is moot because Debtors have removed all such inventory and materials, thus curing any alleged default.

5. Central City alleges that Debtors defaulted under the Lease by damaging certain asphalt curbing on the Shopping Center parking lot. Debtors admit, for purposes of this adversary proceeding only, that they may be responsible for inadvertent damage to certain (but not all) sections of asphalt curbing. Inadvertent damage to the curbing does not constitute a default under any provision of the Lease, but is actionable if at all as an action for waste. Any damage to the asphalt curbing occurred prior to the commencement of Debtors' cases.

In July 1992, Central City submitted, to Debtors, estimates of the cost of repairing the damaged asphalt curbing ranging from $1,950 to $2,300. Debtors have agreed and continue to agree to reimburse Central City for the cost of repairing the asphalt curbing in accordance with the estimates rendered by Central City, thus curing any alleged default. Although the Debtors have offered to pay up to $2,300 for the repair of the curbs to this date, Central City has not retained a contractor to repair the asphalt curbing, nor have repairs to the curbing commenced, proving the de minimis character of the alleged damage. Since the Debtor has offered, upon completion, to pay for the repair of the curb, the continuing existence of curb damage is Central City's fault, not Debtors'.

6. In Paragraph 6 of its Objection, Central City alleges that Debtors defaulted under the Lease by failing to furnish Central City with monthly sales reports. This allegation is moot because Debtors, on or about September 1, 1993, submitted monthly sales reports to Central City for the period December 1992 through July 1993 and the Debtors continue to furnish Central City with monthly sales reports pursuant to the schedule set forth in the Lease. Any prior failure to supply sales reports was inadvertent and inconsequential.

Prior to filing its Objection, Central City had never requested copies of Debtors' 1993 monthly sales reports. Moreover, at the end of each lease year, Debtors have consistently furnished Central City with annual sales reports in order for Central City to calculate percentage of rent. These facts estop Central City from claiming the failure to furnish sales reports as a default.

7. Central City admittedly suffered from a cash flow problem. The Shopping Center contained several empty stores, including a closed movie theater. Although the Debtors were the major anchor tenant and at all times were (and are) current on their rent payments, Central City was unable to service its debt without substantial cash contributions from its partners. The partnership sought to solve its economic problems by refinancing its debt and selling two outlots.

8. The Shopping Center was encumbered by a $2,500,000 first mortgage, held by the Great West Life Assurance Co., with an effective rate of interest of about 11% and a $2,000,000 second mortgage, held by Boat-

men's National Bank. Boatmen's loan was rolled over for two years after the partners provided $800,000 of additional collateral. Mr. Kister estimated that if they could refinance both the first and the second mortgages, at lower, current rates, the partnership could save approximately $15,000 per month. Mr. Kister contacted several banks in an effort to refinance and finally dealt with Sandy Stoner of First Bank. As the negotiations proceeded, First Bank requested various information, including Spirit's financial statement. By letter dated February 19, 1993, Central City, through its attorney, requested a copy of Spirit's financial statement for the use of First Bank in its due diligence in connection with Central City's requests for refinancing. The letter was sent to Al Winterer, Senior Vice President in charge of real estate construction for Central Hardware. He testified that he turned the request over to the financial department, but never heard more about the subject until Central City filed its objections. The Debtors sent the requested financial statements to Central City's attorney on or about September 1, 1993, and argue that any default has thus been cured. Winterer further stated that any failure to provide the consolidated financial statement of Spirit was inadvertent.

9. Central City further alleges that Debtors' failure to timely provide its financial statements to First Bank and its refraining from assumption or rejection of the Lease has "caused significant prejudice" to Central City in that Central City has been unable to refinance its existing debt. As of March 1993, only one bank, First Bank, was considering Central City's request for refinancing. As of March 29, 1993, immediately prior to the filing of Debtors' Chapter 11 cases, there were open issues between First Bank and Central City regarding the partners' guarantees of the loan obligations, the use of loan proceeds, the interest rate, the principal amount of the loan, the liquidity of particular partners, the quality of collateral, and the origination fee or points to be charged in connection with the refinancing.

The loan committee at First Bank has never considered a loan request where the issues of interest, principal amount and the amount of the origination fee were still open. The commencement of Debtors' Chapter 11 cases was the sole, proximate reason for First Bank's denial of Central City's request for credit. Debtors' failure to supply requested financial statements and refraining from assuming or rejecting the lease were not a major or deciding factor in First Bank's decision to deny credit. Ms. Stoner testified the Debtors filing their Chapter 11 bankruptcy was the deciding factor in denying the loan.

10. Central City alleges that Debtors have defaulted under the terms of the Lease by "unreasonably withholding its (sic) consent to the expansion of the [Shopping] Center." Article I of the Original Lease provides that the "Lessor may not make any changes of the surface improvements shown on the area designated as 'Exhibit B' 'ltd. const. area' without consent of Lessee, which consent will not be unreasonably withheld."

Central City proposes to sell two outlots, both located on the portion of the parking lot bordering Lemay Ferry Road. One outlot is proposed to be sold to Tire Properties for construction of a Dobbs Goodyear Service Center pursuant to a sales contract between Central City and Tire Properties dated April 7, 1993. This is a firm offer from Tire Properties (Dobbs Goodyear) to acquire an outlot for $312,500. The other outlot is proposed to be sold to Boatmen's Bank for construction of drive-thru facilities. Central City does not presently have a firm offer from Boatmen's Bank to acquire an outlot, but such a sale was expected to generate a purchase price of $500,000 to $550,000. The two outlots lie within the "limited construction area" shown on Exhibit B to the Original Lease. Accordingly, Central City must obtain the consent of Debtors before it can construct improvements on either of the two outlots.

The parties have negotiated over the Debtors' consent to the sale of these outlots without success. Debtors have not consented to the development of either of the two outlots because the Debtors claim that, based on a reasonable exercise of Debtors' business judgment, the construction of these two im-

provements will harm the Debtors for the following reasons:

A. Debtors wish to again expand their Outside Sales Area in order to accommodate increased sales volume and to replace the Temporary Sales Area. The construction of the Goodyear Service Center and Boatmen's drive-thru facility, as well as any expansion of the Outside Sales Area, will require county zoning approval. Debtors believe that Central City may not be able to obtain approval of all three expansion projects because there are not enough parking spaces to satisfy zoning requirements. The development of the two outlots will thus prevent Debtors from ever obtaining County approval of a subsequent expansion of their Outside Sales Area. Therefore, Debtors have withheld consent to the outlot improvements until Central City agrees to develop the outlots in such a manner as to allow for zoning approval of Debtors' plan to expand their Outside Sales Area.

B. Debtors argue that the proposed Goodyear Service Center and Boatmen's drive-thru facilities will adversely affect sales because the structures will stand at least 22 feet high, thus obstructing the view of the Debtors' Store from potential customers driving along Lemay Ferry Road. Over 50 percent of the area from which Central Hardware's signage is visible would be eclipsed.

The Debtors admit that there is sufficient parking space for the development of one outlot and the future expansion of the Debtors' Outside Sales Area and have expressed a willingness to eventually agree to such an expansion. However, they felt that it was not in their best business judgment to settle only a portion of the problem. At the conclusion of the September 21, 1993 hearing, the Court found that the Debtors had acted reasonably and exercised their best business judgment in not agreeing to the development of both outlots, but their unwillingness to agree to one outlot was unreasonable because such a development would not prevent the Debtors' future expansion and thus their conduct is a nonmonetary violation of the Lease as amended.

## DEBTORS' COUNTERCLAIMS AGAINST CENTRAL CITY

1. The Debtors assert that Central City has defaulted under the terms of Article XVIII of the Lease by failing to keep the common areas clean of empty beer bottles, broken glass and other debris. Article XVIII of the Lease provides that:

> Lessor agrees to maintain ... all parking areas, aisles, footways, access roads, common areas, and utility lines to repair the same, to keep such areas clean, and to remove snow and ice therefrom.... Maintenance shall include all parking lot and access road repair, gardening, insurance, landscaping, trash hauling, line painting, lighting, repairing and resurfacing common areas, and cleaning of snow and ice.... Such repair and maintenance work shall be performed in a good workmanlike manner and shall once commenced be diligently prosecuted to completion.

One of the tenants in the Shopping Center is a bar which serves alcoholic beverages. The bar's patrons are the source of nightly litter, including beer bottles and broken glass. Accordingly, the parking lot in front of Debtors' Store in the morning is unsightly and dangerous to customers. Debtors have received complaints from customers. Such conditions affect Debtors' ability to serve their customers and operate their business. However, the testimony indicated that Central City does, on a regular basis, clean the parking lot of the prior night's litter, including bottles and broken glass, but not before Central Hardware opens for business each morning. The contractor who cleans the lot also cleans several other shopping centers in the area and normally cleans Central City about an hour after opening. Although it may be desirable for the cleaning to begin earlier in the day, the Lease does not prescribe the time when the cleaning should occur and therefore, under these circumstances, I find Central City has not defaulted in its obligation to clean the parking lot.

The parking islands in the parking lot lack any kind of meaningful landscaping, including flowers, shrubs or any type of horticulture or fresh mulching materials. Such parking islands were and are unattractive in

appearance and their condition continues to deteriorate, even though in late July 1993, Central City began mulching certain islands in the parking lot. In addition, Central City has failed to cut the grass and weeds around the rear and sides of the Shopping Center. The result is unsightly common areas which adversely affects Debtors' ability to serve its customers and operate its business. Under the terms of Article XVIII of the Lease, Central City has defaulted by failing to maintain the gardening and landscaping at the Shopping Center.

2. Pursuant to Section 4.3 of the Second Amendment, Central City was required to resurface, with a two inch layer of asphalt, and restripe the parking lot prior to the opening of Central's expanded Store, which officially took place in September, 1992. To date, Central City has not resurfaced or re-striped the parking lot and therefore, is in default of the Lease. Although it has patched some of the pot holes, the parking lot is currently in poor condition. Furthermore, the lines delineating parking spaces have almost completely faded. Customers have complained about the condition of the parking lot. The deteriorated condition of the parking lot may pose a safety hazard and affects Debtors' ability to serve their customers and operate their business at an acceptable level of quality.

3. Pursuant to Article XVII of the Lease, as amended by the Second Amendment, Central City is responsible for maintaining, re-pairing and replacing, if necessary, existing HVAC equipment. Two of the air conditioners in the Store were inoperable during much of the summer of 1993, including August. During the summer, Debtors, through their store manager, gave Central City several oral notices that the HVAC equipment was not operating. However, Central City did not repair or replace the inoperable equipment, for 120 to 145 days. The temperature inside the Store was uncomfortable for customers, sometimes reaching levels in excess of 90° fahrenheit. Debtors received complaints from customers and some customers left the store without purchasing merchandise because of the temperature. The lack of air conditioning adversely affected Debtors'

ability to serve their customers, sell merchandise and otherwise operate their business.

### DISCUSSION

■ The threshold question that must be resolved is whether or not the Debtors' Motion To Assume Conditionally The Unexpired Central City Lease (filed on October 26, 1993) complied with the Court's Order of September 21, 1993, which required Spirit to elect to assume or reject the Lease on or before October 26, 1993. Central City argues that such a conditional response actually represents a failure by the Debtor to timely comply with the Court's September 21 Order and, therefore, the Lease is deemed rejected pursuant to 11 U.S.C. § 365(d)(4). I disagree. Under the procedural history of this adversary, it was difficult for the Debtors to exercise wise business judgment to assume or reject the Lease because the Court had not ruled on several previously-litigated issues. The Debtors' motion unequivocally assumed the Lease subject to certain conditions. Thereafter, at the November 3, 1993 hearing Mr. Collen, attorney for the Debtors, simplified the issue by removing any conditions to the assumption of the Lease by announcing, "Let me make it clear, we are assuming [the Lease]." The Court accepts that oral statement as a clear and unmistakable assumption of the Lease without conditions in full compliance with 11 U.S.C. Section 365(d)(4).

**It is undisputed that Spirit is current in all of its monetary obligations under the Lease.** In its Objection, Central City alleged certain non-monetary defaults, including: (i) Debtors have encroached upon common areas of the Shopping Center by using and occupying common area space for the sale, display and storage of merchandise; (ii) Debtors damaged certain asphalt curbing; (iii) Debtors failed to furnish monthly sales reports; (iv) Debtors "unreasonably" withheld consent for the expansion of the Shopping Center; and (v) Debtors' continuance of the time to assume or reject the Lease has prevented Central City from obtaining refinancing.

In their Answer, Debtors assert that each of the defaults alleged by Central City either

does not exist or has been cured or that the Debtors have offered to cure such defaults. Debtors' Answer also asserts the affirmative defenses that Central City has consented to, waived and is estopped from asserting any objection to Debtors' use of certain portions of the common area, and that Central City is barred by unclean hands and by its failure to do equity because Central City is in default of the Lease. Debtors also assert counter-claims against Central City, including its fail-ure to maintain common areas, landscape certain common areas, resurface and restripe the parking lot, and repair or replace the HVAC equipment in the Store.

The evidence supports the Debtors' asser-tions that most of the non-monetary defaults alleged by Central City, either do not exist, have been cured or the Debtors have offered to cure those defaults. For example:

1. The current Outside Sales Area does not encroach upon common areas, but lies within the scope of the leasehold as contem-plated by the parties and evidenced by the surveys and plans in connection with the 1992 expansion of Debtors' Store pursuant to the Second Amendment. The height and location of the Fence does not constitute a default by Debtors. Rod Jones was Central City's agent and had actual authority from Central City to enter into the May 1, 1992, agreement regarding the moving of the Fence. The initialed diagram of May 1 fur-ther clarified the intent of the parties as to location of the Fence and its height of twelve feet.

2. Debtors are entitled to use the Tempo-rary Sales Area pursuant to the conditions set forth in Article XXXXII of the Lease. Debtors' post-petition use of the Temporary Outside Sales Area did not constitute a de-fault.

3. Central City's claim that Debtors stored inventory on common areas behind their store is now moot, since it was removed as requested.

4. Damage to the asphalt curbing oc-curred prior to the commencement of Debt-ors' Chapter 11 cases. Debtors agree to reimburse Central City, in accordance with the estimates provided by Central City, for the costs of repairing the asphalt curbing allegedly damaged by Debtors.

5. Central City's allegation that Debtors defaulted under the terms of the Lease by failing to furnish monthly sales reports is now moot because Debtors have furnished all past-due reports. Debtors' failure to furnish monthly sales reports constituted a default without harm to Central City (the common law doctrine of *damnum absque injuria*). Accordingly, there exists no basis for dam-ages or any other remedy based on Debtors' failure to furnish sales reports.

6. Central City's allegation that Debtors defaulted under the terms of the Lease by failing to furnish Spirit's financial statement is now moot because Debtors have furnished such statement. Central City's inability to obtain refinancing from First Bank was not caused by Debtors' failure to furnish Spirit's financial statement. Therefore, this default did not harm Central City, and pursuant to the doctrine of *damnum absque injuria,* there exists no basis for damages or any other remedy.

7. Central City's inability to obtain refi-nancing was not caused by Debtors' refrain-ing from assuming or rejecting the Lease. First Bank denied Central City's request for refinancing because of Debtors' commence-ment of the Chapter 11 cases. Loss of fi-nancing because of a bankruptcy filing does not give rise to any cause of action. Debtors have a statutory right to file bankruptcy, 11 U.S.C. § 301, and any contract clause prohib-iting such filing or terminating a lease be-cause of such filing is void, 11 U.S.C. § 365(f).

8. Debtors have justifiably and reasonably withheld consent to the construc-tion of either the Goodyear Service Center or the bank drive-thru facilities, because if both facilities were built, such construction would interfere with the Debtors' own expansion. Accordingly, Debtors' withholding consent to the construction of the Goodyear Service Center or Boatmen's drive-thru facilities does not constitute a default within the terms of the Lease. However, the withholding of Debtors' consent to the construction of both of these outlots was unreasonable and consti-

tutes a default in the Lease. Central City did not offer any proof as to the extent of its monetary damages, if any, by the Debtors withholding consent to the development of one of the outlots. The Court concludes this default can be cured by the Debtors consenting to the development of one of the outlots. Because a final contract was negotiated only on the tire store, the Debtors shall give their consent to the development of the Goodyear Service Center.

■ 9. Central City is in default under the terms of the Lease by failing to resurface and restripe the parking lot pursuant to § 4.3 of the Second Amendment.

10. Central City is in default under the terms of the Lease by failing to repair and replace the HVAC equipment pursuant to Article XVII of the Original Lease as amended by the Second Amendment.

11. Central City is in default under the terms of Article XVIII of the Lease by failing to adequately landscape the islands in the parking lot.

12. Although Central City's defaults may have damaged the Debtors, there was no evidence offered to prove an actual monetary loss. Testimony indicated that customers left the store without purchasing merchandise because of the lack of air conditioning in August. Such testimony indicates that the Debtors were damaged, but it is probably impossible to prove the amount of that damage.

A proposed conclusion of law shall so operate even if it is denominated as a finding of fact, and a finding of fact shall so operate even if it is denominated as a conclusion of law.

The relief requested by Central City in its Objection to require the Debtors to assume or rejected the lease was granted by the Court on September 21, 1993. To cure its default of the Lease, the Debtors shall give their consent to the development of the Goodyear Service Center outlot. Upon Central City's rebuilding of the parking lot curbs the Debtors shall pay the repair expense not to exceed $2,300.

The counterclaims asserted by Debtors in their Answer are granted to the extent that Central City shall conform its conduct to the lease by resurfacing and restriping the parking lot pursuant to the Second Amendment; maintain the HVAC equipment, and landscape the islands in the parking lot pursuant to Article XVII of the original Lease as amended by the Second Amendment.

An Order consistent with this Memorandum Opinion will be entered this date.

## ORDER

1. Spirit and Central are Debtors and Debtors–In–Possession herein, having filed voluntary petitions for relief under Chapter 11, Title 11, United States Code ("Bankruptcy Code") on March 23, 1993 and March 29, 1993, respectively.

2. Central City South Associates ("Central City") is a Missouri general partnership, comprised of fifteen individuals.

3. Spirit is the lessee and Central City is the lessor under a certain lease of non-residential real property dated January 28, 1971 ("Original Lease"), as amended on January 7, 1980 and January 23, 1993, and as further amended by the Second Amendment To Lease dated July 26, 1991 ("second amendment") (collectively, the "Lease"). Pursuant to the Lease, Spirit leases space in Central City South Shopping Center located at 4445 Lemay Ferry Road, St. Louis, Missouri ("Shopping Center"). Central, in turn, subleases the premises from Spirit.

4. After a hearing held on July 21, 1993, this Court entered an order extending the Debtors' time to assume or reject leases for non-residential real property until November 30, 1993, subject to the right of each landlord to seek a shortening of such time for cause shown.

5. On July 21, 1993, Central City filed its Amended Objection To Debtors' Motion For A Second Extension Of Time To Assume Or Reject Unexpired Leases ("Objection"), and, on the same day, this Court deemed Central City's objection to be a motion to compel assumption or rejection of the Lease.

6. On or about September 2, 1993, this Court granted Debtors' motion to apply all of

the rules in Part VII of the Federal Rules of Bankruptcy Procedure.

7. On September 3, 1993, Debtors filed their Answer, Affirmative Defenses and Counterclaims of Spirit Holding Company, Inc. and Central Hardware Company, Inc. to Central City South Associates' Motion To Compel Assumption Or Rejection Of Lease ("Answer").

8. A hearing was held on September 21, 1993 on the Landlord's Objection and Debtors' affirmative defenses and counterclaims. The Court orally entered an Order requiring the Debtors to assume or reject the Central City Lease on or before October 26, 1993, and further orally ordered on the record that:

(i) Debtors did not cause Landlord to be denied refinancing; and

(ii) Debtors reasonably withheld consent to Landlord's proposed development of two outlots together, but unreasonably withheld consent to the proposed development of one of the outlets alone.

The remaining issues raised at the September 21 hearing, concerning the alleged non-monetary defaults asserted in the Landlord's Objection and the Debtors' counterclaims and affirmative defenses were taken under advisement.

9. Debtors neither assumed nor rejected the Lease unconditionally as of October 26, 1993. However, on October 26 the Debtors filed their Motion To Assume Conditionally The Unexpired Central City Lease. The Motion provided in part:

"By this Motion, Spirit elects, and seeks approval of the following election, to assume the Lease, conditioned upon: (i) a finding by the Court that the Debtors are not in default of the Lease and that Landlord has not suffered any actual pecuniary losses which must be cured, or that any defaults or pecuniary losses are so minor that Spirit, in its sole discretion, decides to assume the lease anyway; (ii) the Landlord waiving any objections under § 365 to the assignment of the lease to one of the purchasers of Central; (iii) Landlord's compliance by a date certain with its own obligation under the terms of the Lease and immediate cure of its own defaults; and (iv) Landlord's expansion of the shop-ping center being in full compliance with all applicable local ordinances. Such conditional assumption is legally appropriate when the conditions relate to *lessor's* compliance with the terms of the Lease. No election to assume or reject the sublease between Spirit and Central is made at this time."

The Creditors' Committee filed a statement in support of the Debtors' Conditional assumption of the unexpired lease; while Central City filed its objection. A hearing was held on November 3, 1993 to consider said Motion. During the course of the hearing the Debtors' counsel explained that because the Court had not ruled on the remaining issues raised at the September 21 hearing it was difficult for the Debtors to make an unconditional election. The Debtors preferred to assume conditionally, but in the alternative, if the conditional assumption was unacceptable to the Court, it elected to assume the Lease without conditions. Debtors' counsel stated, "let me make it clear, we are assuming [the Lease]." To make clear its intent, the Debtors orally amended their Motion by removing the conditional aspect of its assumption. On November 3, after the conclusion of the hearing, the Debtors filed their Motion Amending Debtors' Motion To Assume Conditionally The Unexpired Central City Lease, which provided in part:

"1. As an alternative to assuming the Central City Lease ('Lease') upon the conditions set forth in the Motion, Debtor hereby assumes that Lease subject only to such conditions as the Court may impose. If the Court determines not to impose any conditions, then Debtor hereby assumes the Lease without any of the conditions set forth in the Motion."

On November 4, 1993, Central City renewed its objection to the Debtors' Amended Motion. Thereafter, the Bank Group filed its response indicating it supported the Debtors' conditional assumption, but opposed the amended unconditional assumption of the unexpired lease.

As indicated in the Memorandum Opinion, the Court has accepted the assertion of Mr. Collen, the attorney for the Debtors, that he simplified the issue concerning the conditional assumption of the Lease by removing the conditions and announcing "let me make it

clear, we are assuming [the Lease]." The Court accepts that oral statement as a clear and unmistakable assumption of the Lease without conditions in full compliance with 11 U.S.C. § 365(d)(4).

For the reasons set forth in the Memorandum Opinion filed January 11, 1994, it is

ORDERED THAT

(1) the Debtors shall cure their default of the Lease by granting their consent to the sale and development of the Tire Properties for construction of a Goodyear Service Center Outlet pursuant to a sales contract between Central City and Tire Properties dated April 7, 1993; and

(2) Debtors shall, upon completion of the repair of certain asphalt curbing on the shopping center parking lot by Central City, reimburse Central City for those repairs in an amount up to $2,300.00.

IT IS FURTHER ORDERED THAT Central City shall conform its conduct to the Lease by resurfacing and restriping the parking lot pursuant to the Second Amendment, within 120 days from the date of this Order; and maintain the HVAC equipment and landscape the islands in the parking lot pursuant to Article XVII of the original Lease as amended by the Second Amendment.